Bernard MASON, Appellant,

v.

COMMONWEALTH of Kentucky, Appellee.

No. 2009–SC–000070–MR.

Supreme Court of Kentucky.

Jan. 20, 2011.

V. Gene Lewter, Department of Public Advocacy, Frankfort, KY, Counsel for Appellant.

Jack Conway, Attorney General of Kentucky, William Bryan Jones, Office of the Attorney General, Office of Criminal Appeals, Frankfort, KY, Counsel for Appellee.

Opinion of the Court by Chief Justice MINTON.

Bernard Mason appeals as a matter of right [1] from a circuit court judgment sentencing him to twenty years' imprisonment after a jury convicted him of one count of first-degree criminal abuse and of being a second-degree persistent felony offender (PFO 2). Mason contends that he was entitled to a directed verdict on the abuse and PFO charges and that the jury instruction on the abuse charge violated his right to a unanimous verdict under the Due Process Clause of the United States Constitution. We agree that both the guilt phase instructions and the penalty phase instructions created errors. But neither error was preserved for appellate review, and we conclude neither error was so overwhelmingly prejudicial as to rise to the level of being a palpable error. We also conclude that other unpreserved errors occurring in the penalty phase do not necessitate palpable error relief. So we affirm.

## I. FACTUAL AND PROCEDURAL HISTORY.

The grand jury indicted Mason on one count of first-degree criminal abuse, charging that Mason "caused serious injury to [M.M.], a child under 3 years of age, and also placed [M.M.] in a situation that might cause him serious physical injury." Approximately one year following the indictment, Mason was separately indicted for being a PFO 2.

At the beginning of the trial, the Commonwealth was permitted, without objection, to amend the indictment containing the abuse charge to include each of the three ways that one can be guilty of committing first-degree criminal abuse under Kentucky Revised Statutes (KRS) 508.100.[2] The indictment was also amended to track KRS 508.100 more closely by reflecting that the victim, M.M., was less than twelve years of age.

The Commonwealth's first witness was Dr. Jeremy Corbett, who was a resident at the University of Kentucky Medical Center when M.M. arrived there on transfer from another hospital. Dr. Corbett testi-

---

**1.** Ky. Const. § 110(2)(b).

**2.** KRS 508.100(1) provides as follows:

1) A person is guilty of criminal abuse in the first degree when he intentionally abuses another person or permits another person of whom he has actual custody to be abused and thereby:
(a) Causes serious physical injury; or
(b) Places him in a situation that may cause him serious physical injury; or
(c) Causes torture, cruel confinement or cruel punishment;
to a person twelve (12) years of age or less, or who is physically helpless or mentally helpless.

fied that M.M.'s chief injury was a broken right leg and that M.M. had bruising or marks on various parts of his body. Dr. Corbett concluded that these marks or bruises on M.M. were consistent with abuse. And he stated that Mason had told him that he (Mason) was legally blind and had fallen over M.M. when he went into M.M.'s bedroom to check on him. M.M.'s mother apparently related a similar version of events to Dr. Corbett. Dr. Corbett testified that M.M.'s serious fracture was not consistent with Mason's version of the events. But, on cross-examination, Dr. Corbett acknowledged, "anything's possible"; and so he would respond in the affirmative if asked if a million possible scenarios could have caused the fracture.

The Commonwealth next called Dr. Vesna Criss, a professor at the University of Kentucky College of Medicine, who is board-certified in radiology and has a certificate of added qualification in pediatric radiology. Dr. Criss examined x-rays of M.M. and testified that the type of fracture she saw there was not common in two-year-olds. According to Dr. Criss, a direct blow from Mason falling on M.M. would not have caused M.M.'s particular fracture. Instead, she testified that the type of fracture M.M. suffered required the application of a torquing force; although, she did admit on cross-examination that the fracture M.M. suffered could have occurred in a fall if M.M.'s leg had been subjected to some sort of twisting during the fall.

Following Dr. Criss, the Commonwealth presented the testimony of Dr. Tracy Westerfield, who treated M.M. before he was transferred to UK. Dr. Westerfield testified that she noticed bruises on M.M.'s body, including her observation that "there appeared to be what may have been a hand print on the right lower leg." According to Dr. Westerfield's notes, Mason had stated that he fell on M.M. while trying to keep M.M. from falling from his crib. On cross-examination, Dr. Westerfield testified that M.M.'s mother, or another family member, actually may have related to her that version of events. Dr. Westerfield stated that the Cabinet for Families and Children was notified because of the questionable source of M.M.'s injuries.

A social worker later testified that based on an investigation, M.M. was placed in foster care. The social worker stated that he had been told by Mason that M.M. was injured when Mason fell on M.M. after M.M. had gotten out of his crib. The social worker also testified that he witnessed M.M. slap Mason and that M.M. yelled and screamed when Mason approached. The social worker also testified that Mason had stated more than once that the state "may as well" take M.M. if he (Mason) could not physically discipline M.M. Similarly, another social worker testified that Mason had stated that he imposed corporal punishment in attempting to toilet train M.M.

A nurse at the UK hospital testified that she noticed bruises in various stages of healing all over M.M.'s body. The nurse testified that in her experience, the bruises were not common for a child of M.M.'s age.

A third social worker testified that she saw M.M. at UK's emergency room and noticed that M.M. was dirty and bruised and that his ear was discolored, apparently from having been slapped. This social worker stated that Mason had told her that he was the primary caregiver for M.M. since he did not work, but M.M.'s mother did. Also, this social worker testified that Mason stated that M.M.'s bruises stemmed from M.M. repeatedly falling.

After presenting some other evidence not germane to the issues in this appeal,

the Commonwealth closed its case-in-chief. Mason then testified in his own behalf.

Mason testified that he is visually impaired and had attended the Kentucky School for the Blind. Mason testified that on the night M.M. broke his leg, he had heard a thump or loud noise emanating from M.M.'s room. Responding, Mason rushed into M.M.'s room, tumbled over a box, and fell onto M.M. Mason disputed Dr. Westerfield's contention that he had told her that he had fallen onto M.M. while trying to keep M.M. in bed. Mason admitted being a convicted felon but denied abusing M.M.

M.M.'s mother, Merissa Clifton, testified on Mason's behalf. She testified that she worked as a nurse. She was home sick the day M.M. was injured. Clifton stated that she heard a sound from M.M.'s room and that Mason had gone to investigate. Clifton then heard what sounded like someone falling. This sound prompted her to go to M.M.'s room where she saw Mason on his knees and M.M. crying. She then tried to get M.M. to stand up, but he could not put any weight on his right leg.

Mason's brother also testified that he had been doing repairs at Mason's house and that he had moved some items from another room in Mason's home into M.M.'s room.

The trial court instructed the jury that it could find Mason guilty of first-degree criminal abuse only if it found beyond a reasonable doubt all of the following:

A. That in this county on or about December 20, 2006, and before the finding of the Indictment herein, he intentionally abused [M.M.]; AND

B. That he thereby caused a serious physical injury to [M.M.]; OR

C. That he thereby caused [M.M.] to be placed in a situation which might have caused him serious physical injury; OR

D. That he thereby caused [M.M.] to be subjected to torture, cruel confinement, or cruel punishment; AND

E. That [M.M.] was at that time 12 years of age or less.

The jury found Mason guilty of first-degree criminal abuse. At the conclusion of the penalty phase, the jury found Mason guilty of being a PFO 2 and recommended twenty years' imprisonment as his punishment.[3] The trial court sentenced him in accordance with the jury's verdict. Mason filed this appeal as a matter of right.

## II. ANALYSIS.

Mason raises three main arguments supporting reversal of the judgment. He contends that the trial court erred by (1)

---

**3.** It would have been better practice for the jury to have been instructed to return a recommended sentence on the criminal abuse conviction before addressing the PFO charge and any consequent PFO-enhanced sentence. *Commonwealth v. Reneer,* 734 S.W.2d 794, 798 (Ky.1987) ("If the accused is also charged as a persistent felony offender, the penalty phase and a persistent felony offender phase can be combined ... and the jury in the combined bifurcated hearing could be instructed to (1) fix a penalty on the basic charge in the indictment; (2) determine then whether the defendant is guilty as a persistent felony offender, and if so; (3) fix the en-

hanced penalty as a persistent felony offender."). But Mason does not explicitly object to the failure to follow *Reneer,* and we decline to analyze this issue further on our own motion. *See Scott v. Commonwealth,* No. 2008–SC–000814–MR, 2009 WL 4251132, at *1 n. 2 (Ky. Nov. 25, 2009) (citing *Reneer* for proposition that jury should have affixed penalty for underlying offense but holding that "since the failure to recommend a sentence for the underlying rape conviction has not been raised by the parties as an issue and because this case is not otherwise being remanded, we decline to remand for a new sentencing *sua sponte.*").

failing to direct a verdict of acquittal on the criminal abuse charge; (2) instructing the jury on all three alternate ways—despite a lack of proof on all three ways—of committing criminal abuse, which created an issue of unanimity of the guilty verdict on that charge; and (3) allowing numerous irregularities to occur in the penalty phase, including a failure of proof on the PFO 2 charge.

We reject the directed verdict argument, but we agree with Mason that the criminal abuse instruction created an error. But we conclude that error does not rise to the level of being a palpable error. Similarly, we conclude that the errors occurring in the penalty phase also do not necessitate the granting of palpable error relief.

### A. Mason was not Entitled to a Directed Verdict on the Criminal Abuse Charge.

Mason contends he was entitled to a directed verdict on the criminal abuse charge because the Commonwealth "did not establish the elements of the offense under any of its three alternatives." We disagree.

▣ The familiar standard for ruling on a motion for directed verdict is as follows:

> On motion for directed verdict, the trial court must draw all fair and reasonable inferences from the evidence in favor of the Commonwealth. If the evidence is sufficient to induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty, a directed verdict should not be given. For the purpose of ruling on the motion, the trial court must assume that the evidence for the Commonwealth is true, but reserving to the jury questions as to

the credibility and weight to be given to such testimony.

On appellate review, the test of a directed verdict is, if under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt, only then the defendant is entitled to a directed verdict of acquittal.[4]

▣ Under KRS 508.100, in order to prove that Mason committed the offense of first-degree criminal abuse, the Commonwealth needed to prove the following:

1) Mason abused M.M.; AND

2) M.M. was twelve or under at the time of the abuse; AND AT LEAST ONE OF THE FOLLOWING:

 a) The abuse caused M.M. to suffer a serious physical injury; OR

 b) The abuse placed M.M. in a situation that may have caused him to suffer a serious physical injury; OR

 c) The abuse constituted torture, cruel confinement, or cruel punishment.

There is no real question that the Commonwealth proved that M.M. was less than twelve years old. And, examining the evidence in the light most favorable to the Commonwealth, a reasonable juror could have concluded that Mason abused M.M.

To support a finding of abuse, a reasonable juror could have concluded by inference that Mason broke M.M.'s leg. M.M. was apparently uninjured when Mason entered M.M.'s room alone. Dr. Corbett testified that Mason's story did not match the type of fracture M.M. suffered, and Dr. Criss testified that the type of fracture M.M. suffered was not common in a two-year old. Dr. Corbett testified that the bruising on M.M. was consistent with abuse. Dr. Westerfield testified, somewhat tentatively, that her notes reflected

4. *Commonwealth v. Benham,* 816 S.W.2d 186, 187 (Ky.1991).

what might have been a handprint on M.M.'s right lower leg; and a nurse at the UK Medical Center testified that the bruises she observed on M.M. were not common for a two-year old. And, importantly, Mason was apparently the primary caregiver for M.M. So, drawing all reasonable inferences in favor of the Commonwealth and taking into account the totality of the testimony regarding M.M.'s injuries, a reasonable juror could have concluded that Mason abused M.M.[5]

We recognize that Mason presented his own theory of how M.M.'s fracture and bruising occurred. But the jury was free to reject Mason's version of events.

■ Additionally, a reasonable juror could have concluded that the severe nature of the fracture suffered by M.M. satisfied the serious physical injury prong of KRS 508.100. A *"serious physical injury"* is defined at KRS 500.080(15) as "physical injury which creates a substantial risk of death, or which causes serious and prolonged disfigurement, prolonged impairment of health, or prolonged loss or

impairment of the function of any bodily organ...."

Although factually distinguishable, we have held that less severe injuries were enough to constitute a serious physical injury because of the presence of substantial and prolonged pain.[6] Similarly, the Court of Appeals has held that an infant's broken arm was sufficient to support a finding of serious physical injury.[7] Dr. Criss testified that M.M.'s fracture would require a cast for four to six weeks and would take one year to heal completely.

We conclude that the trial court did not err in denying Mason's motion for a directed verdict on the criminal abuse in the first-degree charge because there was sufficient evidence to submit the criminal abuse charge to the jury on the serious physical injury option.[8] Because there was sufficient evidence to submit the case to the jury on at least one method of committing the abuse offense, we need not determine in this section whether there was sufficient evidence to support the alternate methods of committing the of-

5. *Abuse* is defined at KRS 508.090(1), in relevant part, as the "infliction of physical pain ... [or] injury...." Logically, breaking a child's leg would cause the child to suffer physical pain or injury. *See also Carpenter v. Commonwealth*, 771 S.W.2d 822, 824 (Ky. 1989) (holding in abuse case that juror could reasonably infer that defendant was guilty because, among other reasons, defendant and his wife had "exclusive control over the child" on the date the child suffered a head injury).

6. *Parson v. Commonwealth*, 144 S.W.3d 775, 787 (Ky.2004) (holding that headaches, muscle spasms, and arm numbness were enough to support a finding of serious physical injury because "pain is an 'impairment of health.' If the pain is substantial, but not prolonged, it constitutes a 'physical injury[';] but if it is prolonged, then it is a 'serious physical injury.' ").

7. *Clift v. Commonwealth*, 105 S.W.3d 467, 471–72 (Ky.App.2003) ("in the case *sub judice*

reasonable people could differ as to whether the injury suffered by Jack caused 'prolonged impairment of health' or 'prolonged loss or impairment of the function of any bodily organ.' Accordingly, we hold that a reasonable juror could find that the significant impairment of the use of an 11–month–old child's arm for a four-week period constitutes either 'prolonged impairment of health' or 'prolonged loss or impairment of the function of [a] bodily organ' and thus constitutes a 'serious physical injury' under KRS 500.080(15).").

8. We are aware that the trial court did not check the box in the final judgment that would have signified a conclusion that the victim, M.M., suffered death or a serious physical injury; but we, nonetheless, conclude that there was sufficient evidence to support a finding that M.M. did suffer a serious physical injury.

fense.[9] The fact that Mason was not entitled to a directed verdict, however, does not necessarily mean that the trial court acted properly in instructing the jury on all the alternate methods of committing criminal abuse in the first degree.

## B. Unanimity Error Did Not Occur.

 It is not improper to include multiple alternative methods of committing an offense in a single jury instruction.[10] Generally, "[a]ny instruction which permits a conviction on the basis of alternative theories ... not supported by the evidence runs afoul of the due process requirement that each juror's verdict be based on a theory of guilt in which the Commonwealth has proven each and every element beyond a reasonable doubt." [11] On more than one occasion, this Court has held, "[w]hen a jury is presented with alternate theories of guilt and one or more of those theories are unsupported by the evidence, and the verdict *does not reflect under which theory* guilt was found, the defendant has been denied his right to a unanimous verdict." [12] But, as discussed below, this Court has recently refined this principle in the case of superfluous language in the instructions for which there was absolutely no supporting evidence and, therefore, no real potential for a nonunanimous verdict.

Mason contends that error exists in this case because there was insufficient evidence to support all of the three alternate methods of committing criminal abuse in the first degree contained in the jury instruction on that charge. We agree.

 We reject Mason's argument that the trial court erred by permitting the Commonwealth to amend the indictment. No new offense was charged in the amended indictment; and Mason made no contemporaneous objection to the amendment, nor did he make a contemporaneous request for a continuance. So we conclude that there was no error, palpable or otherwise, in the trial court's permitting the Commonwealth to amend the indictment on the day of trial.[13]

 Before we may address the merits of Mason's unanimity argument, however,

---

9. *Campbell v. Commonwealth,* 564 S.W.2d 528, 530 (Ky.1978) ("A motion for a directed verdict of acquittal should only be made (or granted) when the defendant is entitled to a complete acquittal[, *i.e.* ]., when, looking at the evidence as a whole, it would be clearly unreasonable for a jury to find the defendant guilty, *under any possible theory,* of any of the crimes charged in the indictment or of any lesser included offenses.") (emphasis added).

10. *See, e.g., Benjamin v. Commonwealth,* 266 S.W.3d 775, 784 (Ky.2008) ("Therefore, when the evidence will support either mental state beyond a reasonable doubt, a combination murder instruction is certainly proper.").

11. *Commonwealth v. Whitmore,* 92 S.W.3d 76, 81 (Ky.2002).

12. *Purcell v. Commonwealth,* 149 S.W.3d 382, 393–94 (Ky.2004), *abrogated on other grounds by Commonwealth v. Prater,* 324 S.W.3d 393, 398–400 (Ky.2010).

13. *See, e.g., Schambon v. Commonwealth,* 821 S.W.2d 804, 809–10 (Ky.1991) ("Appellants further claim error when the trial court allowed the Commonwealth to amend its indictments at the close of its case in chief. The applicable rule, RCr 6.16, is a lenient rule which provides for the amendment of an indictment at any time before the verdict and upon a finding that no additional or different offense has been charged and that the substantial rights of the defendant are not prejudiced.

The amendment allowed did not result in appellants being charged with a different offense. To the contrary, the amendment merely altered the designation of the subsection of the statute under which appellants were charged. The offense was the same. No additional evidence was required to prove the amended offense and appellants have not shown that they were prejudiced by the amendment. There was no error.").

we must recite the standard of review we must use for this issue. Mason concedes that this issue is not properly preserved. So we must analyze this issue under the palpable error standard set forth in Kentucky Rules of Criminal Procedure (RCr) 10.26.[14] "In order to demonstrate an error rises to the level of a palpable error, the party claiming palpable error must show a 'probability of a different result or [an] error so fundamental as to threaten a defendant's entitlement to due process of law.' "[15]

We have already held that there was sufficient evidence to submit to the jury the issue of whether Mason intentionally caused a serious physical injury to M.M. So there is no inherent error in that portion of the jury instruction. The questions of whether there was sufficient evidence to submit to the jury the issue of whether Mason placed M.M. in a situation that may have caused M.M. to suffer a serious physical injury and whether there was sufficient evidence to submit to the jury the question of whether Mason caused M.M. to suffer torture, cruel confinement, or cruel

punishment are more problematic. As Professors Lawson and Fortune observe in their treatise on Kentucky criminal law, those alternate methods of committing criminal abuse "are less precisely defined and [are] fraught with difficulty...." [16]

### 1. Placing M.M. in a Situation that May Have Caused Serious Physical Injury.

According to KRS 508.100(1)(b), a person may commit criminal abuse in the first degree if he "intentionally abuses another person ... and thereby ... [p]laces him in a situation that may cause him serious physical injury...." The General Assembly did not see fit to define more precisely what situations may place an abused person in a situation that may cause that abused person to suffer a serious physical injury.[17] Since the crucial word *may* does not appear to us to be a technical term or a specialized term that has "acquired a peculiar and appropriate meaning in the law," [18] we must construe the phrase "places him in a situation that may cause him serious physical injury" consistent

---

14. RCr 10.26 provides that "[a] palpable error which affects the substantial rights of a party may be considered by the court on motion for a new trial or by an appellate court on appeal, even though insufficiently raised or preserved for review, and appropriate relief may be granted upon a determination that manifest injustice has resulted from the error."

15. *Allen v. Commonwealth*, 286 S.W.3d 221, 226 (Ky.2009) (quoting *Martin v. Commonwealth*, 207 S.W.3d 1, 3 (Ky.2006)).

16. Robert G. Lawson & William H. Fortune, Kentucky Criminal Law § 9–6(b) (1998). *See also Stoker v. Commonwealth*, 828 S.W.2d 619, 624 (Ky.1992) ("The Criminal Abuse statute, enacted in 1982, is one of the many statutes creating crimes subsequent to the unified and coordinated 1974 Kentucky Penal Code, lacking the clarity and precision of the Code.").

17. Mason has not directly attacked KRS 508.100 as being void for vagueness, perhaps because our precedent holds that it is not. *Carpenter*, 771 S.W.2d at 824. However, despite apparently being directly asked to do so, in *Carpenter*, we did not directly address what limits should be given the somewhat ambiguous term "may." *Id.* ("The Carpenters argue that the word 'may' as used in K.R.S. 508.100(1)(b) does not provide a fair description of the prohibited conduct because virtually any conduct directed toward the child had the possibility of placing the child in a situation that may cause serious physical injury. A proper interpretation of the statute as a whole is that it does not apply to every situation where a child is injured but only to those instances where abuse is involved.").

18. The only statutory definition of *"may"* is the unhelpful note in KRS 446.010(20) that *may* "is permissive...."

with the "common and approved usage of language...." [19] So we shall construe *may* to mean, "have the ability or competence to...." [20] In order for Mason to have been guilty of first-degree criminal abuse under KRS 508.100(1)(b), therefore, Mason must have intentionally abused M.M. and thereby placed M.M. in a situation that had the ability to cause M.M. to suffer a serious physical injury.

No witness directly testified that Mason intentionally abused M.M. The Commonwealth relies upon the fact that Mason was the primary caregiver for M.M., along with the fact that testimony indicated that M.M. had numerous bruises or similar bodily injuries, which were atypical for a child of his age. Even if we were to accept that a reasonable inference could be drawn that Mason abused M.M., the Commonwealth has cited to no evidence showing that M.M.'s bruises were of such a severe nature, either singly or in combination, to rise to the level of having the ability to cause M.M. to suffer a serious physical injury.

Intentionally causing bruises to appear on a child, although certainly improper, is not typically conduct so egregious as to have the ability to cause a *serious physical injury*, meaning an injury "which creates a substantial risk of death, or which causes serious and prolonged disfigurement, prolonged impairment of health, or prolonged loss or impairment of the function of any bodily organ...." [21] As we stated in a case involving an assault charge against a child stemming from a child being burnt with a lighter, "[w]ithout in any way depreciating the hideous nature of such an act, the fact remains that there was nothing to prove that this child was in danger of death from this injury, or from any other injury inflicted upon [him]." [22]

Were the bruises the only injuries suffered by M.M., we may well have concluded that there was insufficient evidence from which a reasonable juror could have concluded that Mason placed M.M. in a situation which "may" have caused M.M. to have suffered a serious physical injury. But, as previously discussed, M.M. also suffered a serious fracture in his leg; and we have already concluded that there was sufficient evidence from which a reasonable juror could have concluded that Mason caused the fracture and that the fracture constituted a serious physical injury. Logically, in order to have broken M.M.'s leg, Mason would have had to have placed M.M. in a place or situation in which the leg could have been broken. Following that logic, a reasonable juror could have reached the conclusion that Mason placed M.M. in a situation that may have caused M.M. to have suffered a serious physical injury. After all, in order to suffer a serious physical injury, one must have

---

19. KRS 446.080(4) ("All words and phrases shall be construed according to the common and approved usage of language, but technical words and phrases, and such others as may have acquired a peculiar and appropriate meaning in the law, shall be construed according to such meaning.").

20. WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (UNABRIDGED) 1396 (1993).

21. KRS 500.080(15).

22. *Souder v. Commonwealth,* 719 S.W.2d 730, 732 (Ky.1986) (overruled on other grounds by *B.B. v. Commonwealth,* 226 S.W.3d 47, 51 (Ky.2007)). *See also Holbrook v. Commonwealth,* 925 S.W.2d 191, 193 (Ky.App.1995) (paddling by teacher that resulted in student having bruised buttocks insufficient to constitute serious physical injury); *Carpenter,* 771 S.W.2d at 826 (Leibson, J., dissenting) (opining in criminal abuse case that "[t]here was no evidence from which to conclude that these partially healed rib fractures met any minimally acceptable definition for a serious physical injury.").

been in a situation that may have resulted in a serious physical injury.

■ In other words, it would be illogical for us to conclude that a reasonable juror could have found that Mason actually caused M.M. to suffer a serious physical injury while simultaneously concluding that a juror could not have found that Mason merely placed M.M. in a situation that *may* have caused M.M. to suffer a serious physical injury. Accordingly, we hold that there was sufficient evidence reasonably to support a conclusion or inference that Mason's abuse caused M.M. to be placed in a situation that had the ability to cause M.M. to have suffered a serious physical injury.

## 2. Causing M.M. to Suffer Torture, Cruel Confinement, or Cruel Punishment.

■ We next must determine if error exists with the instruction that permitted the jury to convict Mason if it believed he intentionally abused M.M. and thereby tortured, cruelly confined, or cruelly punished M.M. We conclude the instruction was erroneous but did not constitute palpable error.

### a. Cruel confinement.

Simply put, the Commonwealth has shown us no facts that tend to prove that Mason caused M.M. to suffer cruel confinement. Indeed, the Commonwealth does not specifically cite to any conduct by Mason that even arguably could be construed as Mason's having confined M.M.,

cruelly or otherwise. At most, the evidence would support an inference that Mason somehow restrained M.M. by unknown means resulting in M.M.'s broken leg. But we do not believe that restraining M.M. for an unknown period, likely extremely brief in duration, by unknown means constitutes cruel confinement. In short, the Commonwealth has pointed to no evidence at all to show that M.M. was confined by Mason. The inclusion of cruel confinement language in the jury instruction was, therefore, erroneous.[23]

### b. Cruel punishment.

Although it does not really address or defend the cruel confinement aspect of the instruction, the Commonwealth does argue that there was sufficient evidence of cruel punishment. To support its argument, the Commonwealth again relies upon the bruises on M.M., which were characterized as being consistent with abuse and atypical of children of M.M.'s age.

■ Although government is prohibited by the Eighth Amendment to the United States Constitution and Section Seventeen of the Kentucky Constitution from imposing cruel punishment, "[w]hat constitutes cruel ... punishment has not been exactly decided."[24] Instead, the prohibition on cruel punishment "embodies broad and idealistic concepts of dignity, civilized standards, humanity, and decency...."[25] In Kentucky, we have held that cruel punishment is "that punishment which shocks the conscience and violates the principles of fundamental fairness."[26] The Court of

---

**23.** *See, e.g., Whitmore,* 92 S.W.3d at 80–81 (error when trial court instructed jury that it could convict Whitmore of trafficking in a controlled substance by possessing cocaine with the intent to distribute, dispense, sell, or transfer it to another when there was "no evidence that Whitmore possessed the cocaine with the intent to manufacture or dispense it.").

**24.** 24 C.J.S. *Criminal Law* § 2197 (2010).

**25.** *Id.*

**26.** *Canler v. Commonwealth,* 870 S.W.2d 219, 222 (Ky.1994) (*citing Workman v. Commonwealth,* 429 S.W.2d 374 (Ky.1968)).

Appeals has also cited, with approval, a dictionary definition of *cruel* as " 'disposed to inflict pain or suffering. . . .' " [27]

Under those working definitions, we conclude that a juror could have reasonably inferred that Mason inflicted cruel punishment upon M.M. It is possible that the infliction of bruises consistent with abuse was sufficient to constitute cruel punishment since our precedent holds that even spanking a child may, at least in extreme situations, constitute cruel punishment under KRS 508.100.[28] Regardless of the bruises, however, we have no doubt that intentionally breaking a child's leg, at least under the facts of this case, rises to the level of cruel punishment. So construing all the evidence in the light most favorable to the Commonwealth and drawing all reasonable inferences in its favor, we conclude there was sufficient evidence for a reasonable juror to conclude that M.M. subjected Mason to cruel punishment.

### c. Torture.

We, likewise, believe that there was sufficient evidence for a juror to conclude reasonably that Mason tortured M.M.

We have not had many occasions to determine what conduct constitutes torture under KRS 508.100. In *Stoker*, we had "no difficulty" in determining that "tying up . . . children, putting tape over their mouths, and forcing them to watch pornographic movies, can reasonably and appropriately be deemed by a jury to constitute 'torture, cruel confinement or cruel punishment'. . . ." [29] Likewise, we held that hitting children with a wire coat hanger was "sufficient to sustain the charges because the children testified to circumstances proving the nature of the beatings to have been cruel and indiscriminate, and far different in character from normal parental discipline." [30] As Professors Lawson and Fortune point out, however, "[t]he case law is otherwise unhelpful as to the meaning of the provision. . . ." [31]

In the case at hand, M.M. did not testify—and we have been pointed to no other testimony clearly indicating—that M.M.'s bruises were a direct result of Mason's having struck M.M. with a coat hanger or any other similar instrument. Nor is there any evidence showing that M.M. was restrained and forced to watch pornographic movies. So whether the conduct at issue constitutes torture is not readily answered by reference to our existing precedent.

■ We, therefore, turn to the dictionary to determine what kind of behavior constitutes torture, at least for purposes of criminal abuse charges. *"Torture"* is defined as "the infliction of intense pain (as from burning, crushing, wounding) to punish or coerce someone. . . ." [32] Indeed, the United States Supreme Court has opined that the "primary concern" of the drafters of the Eighth Amendment's prohibition on cruel or unusual punishment was to prohibit torture and similarly barbaric types of punishment.[33] Although no one defini-

---

**27.** *Cutrer v. Commonwealth*, 697 S.W.2d 156, 158 (Ky.App.1985) (*quoting* WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 311 (1984)).

**28.** *Canler*, 870 S.W.2d at 222 ("It is the jury's function to determine whether the amount of force used during a spanking constitutes cruel punishment. . . . [W]e do not find that spanking can never be cruel punishment. . . .").

**29.** 828 S.W.2d at 625.

**30.** *Id.*

**31.** LAWSON & FORTUNE, *supra*, § 9–6(b).

**32.** WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (UNABRIDGED) 2414 (1993).

**33.** *Estelle v. Gamble*, 429 U.S. 97, 102, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976).

tion can cover all the possible methods of torturing someone, we agree with the Court of Appeals of Michigan's general conclusion that "before a defendant may be convicted of child torture, it need only be shown that he ... inflicted extreme, intense or severe pain or injury upon the victim." [34] Thus, although the terms are generally used interchangeably, it appears that torture may require the infliction of greater pain through more barbaric methods than does cruel punishment.

Although it is a difficult question, which will necessarily have to be resolved on a case-by-case basis, we are unwilling to say as a matter of law under the facts of this case that abusing a child in such a manner as to cause a severe fracture in the child's leg, as well as inflicting multiple bruises and similar marks all over the child's body, is insufficient to constitute torture. Although one cannot know for sure what M.M. actually felt since he was too young to testify, we have no doubt that the diverse injuries M.M. suffered must logically have caused him to suffer "extreme, intense or severe pain...." [35] We held in a somewhat similar unpublished case that evidence showing multiple bruises and abrasions all over the body of a three-year-old child was sufficient to constitute either torture or cruel punishment.[36] There was sufficient evidence, therefore, for the issue of whether Mason tortured M.M. to be submitted to a jury.

### 3. Application of Palpable Error Standard.

■ After examining the instructions in detail, we agree with Mason that an error exists by virtue of the inclusion of the cruel confinement language. Since this error is unpreserved, we must now determine whether it rises to the level of being a palpable error.

■ We begin our analysis by acknowledging that erroneous jury instructions are presumed to be prejudicial.[37] And, as previously mentioned, we have forcefully held that "[a]ny instruction which permits a conviction on the basis of alternative theories ... not supported by the evidence runs afoul of the due process requirement that each juror's verdict be based on a theory of guilt in which the Commonwealth has proven each and every element beyond a reasonable doubt." [38]

We recently clarified the law as to this precise scenario: unpreserved errors involving superfluous language in jury in-

---

34. *People v. Porterfield,* 166 Mich.App. 562, 420 N.W.2d 853, 854 (1988). *See also Faust v. State,* 354 So.2d 866, 868 (Fla.1978) (finding constitutional a statutory definition of *torture* as "every act, omission, or neglect whereby unnecessary or unjustifiable pain or suffering is caused.") (quotation marks omitted).

35. *Porterfield,* 420 N.W.2d at 854.

36. *Beasley v. Commonwealth,* No. 2001–SC–000539–MR, 2003 WL 22974888, at *6 (Ky. Dec. 18, 2003) (rejecting argument that defendant was entitled to a directed verdict on criminal abuse charge by first reciting bruises and abrasions found on the victim and then concluding that "[i]n the present case, D.H. had signs of physical abuse, literally, all over

his body. Indeed, the extent of the mistreatment of D.H. not only supports a finding that it 'shocks one's conscience' but also supports a finding that it was 'heartless and unfeeling.' Accordingly, based on the testimony of Dr. Burrows and the exhibits, we find that the evidence clearly supported the jury's finding that the abuse resulted in torture or cruel punishment to D.H."). By virtue of his broken leg, M.M.'s injuries appear to be even more severe than those suffered by the victim in *Beasley.*

37. *Harp v. Commonwealth,* 266 S.W.3d 813, 818 (Ky.2008).

38. *Whitmore,* 92 S.W.3d at 81 (emphasis added).

structions that would permit a conviction based upon a method of committing an offense permitted by statute but not supported by the evidence.[39] In *Travis,* the trial court's PFO instruction "contain[ed] language describing theories of liability that do not relate to any evidence presented ... at trial.... [S]uch language was simply inserted to reflect the various possible theories of statutory liability, notwithstanding their inapplicability to the instant case."[40] We concluded that the instructions containing superfluous theories of guilt were error but that the error was not palpable.[41] We reasoned that there was "no real possibility that jurors followed one of the theories presented by the surplus language and, as a result, no real possibility that a unanimous verdict was denied."[42]

Similarly, in the case at hand, we conclude that there is no "real possibility" that a juror voted to convict Mason under the cruel confinement theory when there was no evidence to support that theory, but there was ample evidence to support the other theories of guilt. So there was no probability that the result of the action was altered by the addition of the superfluous theories of guilt in the criminal abuse instruction. We conclude, therefore, that the erroneous criminal abuse instruction fails to constitute palpable error.

## C. Penalty Phase Errors Do Not Necessitate Palpable Error Relief.

Although he admits that the issues are unpreserved, Mason raises several penalty phase arguments. We are concerned about some irregularities that occurred during the penalty phase, but we conclude that none of the unpreserved issues necessitates granting palpable error relief.

The Commonwealth sought to introduce many exhibits in the penalty phase, including Exhibit 19—a collection of documents that includes Mason's purported previous federal felony conviction. No objection was raised. But the trial court, perhaps inadvertently, did not orally include Exhibit 19 as among those exhibits admitted into evidence. So that exhibit was never formally admitted into evidence. The Commonwealth did not attempt to rectify the trial court's omission of Exhibit 19 from those exhibits admitted into evidence.[43] Mason contends on appeal that the failure to introduce formally Exhibit 19 into evidence means that there was insufficient evidence to convict him of being a PFO, so he argues he should have received a directed verdict. Of course, Mason's argument is problematic because his trial counsel failed to move for a directed verdict.

 A PFO conviction, like any other criminal conviction, must be based upon properly admitted evidence.[44] Argu-

---

**39.** *See Travis v. Commonwealth,* 327 S.W.3d 456 (Ky.2010).

**40.** *Id.* at 462.

**41.** *See id.* at 463 (majority concluding that error was harmless). *See also id.* at 463–64 (Minton, C.J., concurring in result only and concluding that error was not palpable).

**42.** *Id.* at 463.

**43.** *See, e.g., Thompson v. Commonwealth,* 147 S.W.3d 22, 40 (Ky.2004) ("Even when an objection or motion has been made, the bur-

den continues to rest with the movant to insist that the trial court render a ruling....").

**44.** *See, e.g., Parker v. Commonwealth,* 291 S.W.3d 647, 660 (Ky.2009) ("a jury's verdict must be based on the evidence actually admitted into evidence...."); 1 WILLIAM S. COOPER KENTUCKY INSTRUCTIONS TO JURIES (CRIMINAL) § 2.02 (5th ed.2006) ("You shall find the Defendant not guilty unless you are satisfied from the evidence alone and beyond a reasonable doubt that he is guilty.").

ments of counsel are not evidence.[45] We have held that it is not absolutely necessary to introduce into evidence certified copies of prior judgments in PFO proceedings if a qualified witness testifies from the relevant documents with sufficient completeness to prove the elements of the PFO charge.[46] But the Commonwealth presented no live witnesses in Mason's PFO proceeding.[47] Since there was no oral testimony presented to the jury, the Commonwealth's failure to ensure the admission into evidence of a document purporting to be a felony judgment from the United States District Court for the Western District of Kentucky was an error.

Under the unique facts of this case, however, we do not believe Mason is entitled to palpable error relief. Mason does not contend that he was not convicted in federal court, as the purported felony judgment contained in Exhibit 19 shows. Indeed, Mason does not even argue that the judgment contained in Exhibit 19 was inadmissible. It is clear that the Commonwealth sought to introduce Exhibit 19, Mason had no objection whatsoever to the introduction of that exhibit, and the trial court seemingly intended to introduce Exhibit 19 into evidence but inadvertently failed to do so. (Exhibit 19 was included in the record on appeal and was sent back with the jury.) After all, given the lack of any objection whatsoever by Mason, there would have been no obvious reason for the trial court to have intentionally failed to grant the Commonwealth's motion introduce it into evidence. Obviously, the Commonwealth should have pressed the trial court for an unmistakable ruling that Exhibit 19 had been formally introduced into evidence. But given: (1) the undisputed accuracy of the judgment contained in Exhibit 19; (2) the lack of objection to its introduction into evidence;[48] and (3) the trial court's ostensible intention to admit it into evidence, we cannot say that the trial court's curious procedural failure to admit Exhibit 19 into evidence was such an egregious, unjustifiable mistake as to necessitate palpable error relief in the form of this Court ordering the trial court to grant a directed verdict, which was never contemporaneously sought.

In order to adduce sufficient evidence to convict Mason of being a PFO 2, the Commonwealth was required to show that Mason:

is more than twenty-one (21) years of age and ... stands convicted of a felony after having been convicted of one (1) previous felony. As used in this provision, a previous felony conviction is a conviction of a felony in this state or

---

**45.** *Dixon v. Commonwealth*, 263 S.W.3d 583, 593 (Ky.2008) ("But an attorney's arguments do not constitute evidence.").

**46.** *Commonwealth v. Mixon*, 827 S.W.2d 689, 691 (Ky.1992) ("In conclusion, we hold that under these circumstances it is not mandatory for certified copies of judgments of conviction to be admitted into evidence in support of a PFO charge. It is sufficient for oral testimony based upon documentary evidence to be received in support of the elements of the charge. In the absence of objection at trial, failure to admit the documentary evidence will not be reviewed on appeal.").

**47.** Although better practice might be to present live testimony from qualified witnesses, we reject Mason's argument, unsupported by any citation to authority, **that palpable error occurred when the Commonwealth failed to** present live testimony to obtain a PFO conviction.

**48.** In all likelihood, if Mason had moved for a directed verdict based upon a lack of proof (*i.e.*, the trial court's inexplicable failure to formally introduce Exhibit 19 into evidence), the Commonwealth would have asked for— and likely would have been granted—permission to re-open its case-in-chief to again tender Exhibit 19 into evidence.

conviction of a crime in any other jurisdiction provided:

(a) That a sentence to a term of imprisonment of one (1) year or more or a sentence to death was imposed therefor; and

(b) That the offender was over the age of eighteen (18) years at the time the offense was committed; and

(c) That the offender:

1. Completed service of the sentence imposed on the previous felony conviction within five (5) years prior to the date of commission of the felony for which he now stands convicted; or

2. Was on probation, parole, conditional discharge, conditional release, furlough, appeal bond, or any other form of legal release from any of the previous felony convictions at the time of commission of the felony for which he now stands convicted; or

3. Was discharged from probation, parole, conditional discharge, conditional release, or any other form of legal release on any of the previous felony convictions within five (5) years prior to the date of commission of the felony for which he now stands convicted; or

4. Was in custody from the previous felony conviction at the time of commission of the felony for which he now stands convicted; or

5. Had escaped from custody while serving any of the previous felony convictions at the time of commis-

sion of the felony for which he now stands convicted.[49]

 The trial court instructed the jury on all five paths to reach PFO 2 described in KRS 532.080(2)(c). The Commonwealth seems to concede that the proof did not support all five methodologies. Instead, the Commonwealth only states that Exhibit 19 conclusively showed that Mason was released from supervision within five years of committing the abuse charge in question, thereby satisfying KRS 532.080(2)(c)(3). So as with the guilt phase instructions, the PFO instruction created an error resulting from the trial court's inclusion of methods of committing the PFO offense that were not supported by the evidence.

But, as with the guilt phase instruction, we conclude that the PFO instruction's inclusion of superfluous methods of committing a PFO offense is not a palpable error because there was "no real possibility that jurors followed one of the theories presented by the surplus language and, as a result, no real possibility that a unanimous verdict was denied." [50] The question becomes, therefore, whether there was sufficient proof that Mason was a PFO under the theory advanced by the Commonwealth: Mason's having been released from supervision within five years of committing the abuse charge in question, thereby satisfying KRS 532.080(2)(c)(3).[51] We conclude that there was sufficient proof.

Part of Exhibit 19 was a supervision summary that showed that Mason was re-

**49.** KRS 532.080(2).

**50.** *Travis,* 327 S.W.3d at 463.

**51.** *Campbell,* 564 S.W.2d at 530 ("A motion for a directed verdict of acquittal should only be made (or granted) when the defendant is entitled to a complete acquittal[, *i.e.* ]., when,

looking at the evidence as a whole, it would be clearly unreasonable for a jury to find the defendant guilty, *under any possible theory*, of any of the crimes charged in the indictment or of any lesser included offenses.") (emphasis added).

leased from federal supervision within five years of the commission of the abuse of M.M. As stated previously, there was no contemporaneous objection to Exhibit 19, meaning that we have no cause to dispute the accuracy of that supervision report. So there was proof that Mason had been released from federal supervision within five years of committing the abuse charge in question—thereby satisfying KRS 532.080(2)(c)(3). Likewise, a portion of Exhibit 19, combined with guilt phase testimony of a social worker, provides sufficient evidence that Mason was over twenty-one years old when the abuse conviction at hand occurred and was over eighteen years old when the federal felony offense was committed.

Mason raises a perfunctory argument that some information contained in Exhibit 19 runs afoul of the hearsay doctrine set forth in Crawford v. Washington.[52] The root of this argument is, again, Mason's contention that the Commonwealth failed to present live testimony during the penalty phase. Again, however, this issue is unpreserved because Mason's counsel lodged no objection at trial. If Mason believed live witnesses were necessary to explain or contradict portions of Exhibit 19, he could have called the witnesses himself or, at a minimum, he could have objected to the Commonwealth's failure to present witnesses. We need not engage in an extended review of whether portions of Exhibit 19 may contain inadmissible hearsay because we conclude that any hearsay-based error was not so egregious and damaging to the fundamental fairness of Mason's trial as to rise to the level of being a palpable error, especially since Mason, despite having had more than ample time to do so, still has not pointed to any specific inaccuracies in the supervision report or any other factual recitation contained in Exhibit 19.[53]

Next, we reject Mason's contention—unsupported by any citation to authority—that his federal sentence of twelve months and one day of imprisonment is insufficient to qualify as a prior felony conviction under KRS 532.080(2)(a), which requires a previous felony conviction to have involved the imposition of "a sentence to a term of imprisonment of one (1) year or more...." Obviously, a year is twelve months in duration. So a reasonable juror could have concluded that Mason's federal sentence of twelve months and one day of incarceration was a sentence of one year or more, as required by KRS 532.080(2)(a).

In short, we conclude that there was sufficient proof whereby a reasonable juror could have found Mason guilty of being a PFO 2. Consequently, we decline to hold that palpable error occurred when the trial court failed to grant a directed verdict on its own motion while Mason remained mute.

We also decline to find that the Commonwealth's closing argument constitutes palpable error. Again, Mason failed to object contemporaneously, rending this issue unpreserved. We have considered all

52. 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).

53. We generally agree with Mason that any extraneous materials should have been redacted from Exhibit 19, such as charges for which Mason was not convicted. Mixon, 827 S.W.2d at 690–91 ("There are sound reasons for not offering into evidence complete written records as to prior convictions but rather to permit the jury to hear only relevant testimony extracted therefrom. Frequently there are additional charges which were joined but on which the defendant was acquitted. 'Laundering' or 'sanitizing' is necessary to prevent unnecessary prejudice to the defendant."). But Mason raised no objection whatsoever below to the lack of redaction, and we conclude that no palpable error resulted from the lack of redaction of the extraneous portions of Exhibit 19.

of Mason's sundry attacks on the Commonwealth's closing argument but have concluded that no portion of the argument constitutes palpable error.

Finally, we decline Mason's request for this Court to order the Department of Corrections to classify him as a non-violent offender. It is uncontested that at trial the Commonwealth urged the jury to recommend that Mason serve the maximum permissible sentence (twenty years' imprisonment by virtue of the PFO conviction) and that Mason would be eligible for parole after serving four years of that sentence (twenty percent of the sentence). The jury recommended the requested twenty-year sentence, and the trial court entered a final judgment in accordance with that recommendation. Relying upon his inmate resident record card,[54] Mason contends that the Department of Corrections has classified him as a violent offender required to serve eighty-five percent of his sentence before becoming eligible for parole. Mason contends that the Department of Corrections' classification of him is erroneous and contrary to what the jury was told at trial. Mason contends, therefore, that he should either receive a new penalty phase or that this Court should order the Department of Corrections to reclassify his parole eligibility date. We disagree.

KRS 439.3401 governs which offenders shall be deemed *violent offenders*. Subsection (1)(i) of that statute provides that persons who commit criminal abuse in the first degree are *violent offenders*. So Mason is a *violent offender*.

*Violent offenders* are generally subjected to more onerous parole eligibility requirements. As it pertains to this case, KRS 439.3401(3) provides that a violent offender "who has been convicted of a capital offense or Class A felony with a sentence of a term of years or Class B felony who is a violent offender shall not be released on probation or parole until he has served at least eighty-five percent (85%) of the sentence imposed." First-degree criminal abuse is statutorily designated as a Class C felony.[55] So it appears from the limited record before us that Mason is not statutorily subjected to the rule requiring him to serve eighty-five percent of his sentence before becoming eligible for parole, even though Mason is statutorily classified as a violent offender by virtue of his having been convicted of criminal abuse in the first degree.[56]

We do not know the reasoning underlying the General Assembly's peculiar decision to require some, but not all, violent offenders to be subjected to the more stringent parole eligibility requirements contained in KRS 439.3401. But the question before us in this case is not the wisdom of the General Assembly's classification and treatment of violent offenders for parole eligibility purposes; instead, the question is whether the Department of Corrections' ostensibly improper imposition of the eighty-five percent rule upon Mason entitles Mason to relief in this direct appeal.

 It is important to focus upon the fact that there appears to have been no error committed by the Commonwealth or the trial court during Mason's trial on this issue. After all, both parties to this appeal agreed below and agree on appeal that Mason should not be subjected to the

---

54. Mason has attached his resident record card as an exhibit to his brief. The Commonwealth has not raised any objection to Mason's usage of that resident record card or to its accuracy.

55. *See* KRS 508.100(2).

56. Even the Commonwealth admits in its responsive brief that "the correct interpretation of the statute [KRS 439.3401] would not make [Mason] subject to the 85% rule."

eighty-five percent rule, Because there was no discernible error committed in the penalty phase of Mason's trial, we decline Mason's invitation to order a new penalty phase. Instead, the apparent error was committed post-judgment by the Department of Corrections, which is not a party to this appeal.

Although Mason contends that he should not be compelled to file a separate action in order to receive relief from this potential mistake, it is beyond dispute that a court generally should not issue an opinion or judgment against an entity that is not a party to the action or is not otherwise properly before the court. We decline, therefore, to order the Department of Corrections—which has not been made a party to this appeal and is not properly before us to either defend its action or to confess error—to take any affirmative action with regard to Mason's offender classification or parole eligibility. Mason is free to file a separate action against the Department of Corrections, such as a declaratory judgment action, seeking to have his parole eligibility recalculated.[57] We trust that such an action would prove to be successful if Mason were to demonstrate satisfactorily that the Department of Corrections had materially erred in calculating his parole eligibility date.

## III. CONCLUSION.

For the foregoing reasons, Bernard Mason's criminal abuse and PFO 2 convictions are affirmed.

All sitting. All concur.

---

**57.** *See, e.g., Hoskins v. Commonwealth,* 158 S.W.3d 214, 217 (Ky.App.2005) ("We agree with the Commonwealth that Hoskins's attack on his violent-offender classification is not procedurally correct. As noted by the Commonwealth, it appears that the correct path for Hoskins to have taken was to proceed against the Department of Corrections with an original action before the Franklin Circuit Court.").