RENDERED:  MARCH 26, 2021; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2020-CA-0202-MR

JUSTIN C. GREEN                                                        APPELLANT

v.
APPEAL FROM EDMONSON CIRCUIT COURT
HONORABLE TIM R. COLEMAN, JUDGE
ACTION NO. 19-CR-00038

COMMONWEALTH OF KENTUCKY                                    APPELLEE

OPINION
AFFIRMING

** ** ** ** **

BEFORE:  DIXON, KRAMER, AND MCNEILL, JUDGES.

KRAMER, JUDGE:  Justin Green was convicted in Edmonson Circuit Court of

committing third-degree criminal abuse in violation of KRS[1] 508.120 against his

minor son, B.G.  He now appeals, arguing (1) the evidence presented at trial did

---

[1] Kentucky Revised Statute.

not support an instruction for third-degree criminal abuse; and (2) the trial court erred by permitting his victim to testify *in camera*. Upon review, we affirm.

## JURY INSTRUCTIONS

The jury was instructed to determine whether Green was guilty of several offenses, including but not limited to[2] first-degree criminal abuse[3] (Instruction No. 4), second-degree criminal abuse[4] (Instruction No. 5), or third-degree criminal abuse (Instruction No. 6). It found him guilty of third-degree criminal abuse under Instruction No. 6, which provided:

> If you do not find the Defendant guilty under either Instruction No. 4 or Instruction No. 5, you will find the Defendant, Justin C. Green, Guilty of Criminal Abuse in the Third Degree under this Instruction if, and only if, you believe from the evidence beyond a reasonable doubt all of the following:
>
> > (a) That in this county on or between January 29, 2019 through January 30, 2019 and before the finding of the Indictment herein, he recklessly abused [B.G.] by striking him on the back;
> >
> > (b) That he thereby caused [B.G.] to be subjected to cruel punishment;
>
> AND

---

[2] The jury was also instructed to determine whether Green was guilty of assault and witness tampering.

[3] KRS 508.100.

[4] KRS 508.110.

(c) That [B.G.] was at the time twelve (12) years of age or less.

On appeal, Green does not contest that this instruction is legally consistent with KRS 508.120.[5]  He also does not contest that the evidence adduced at trial supported that he struck his victim, B.G., who was seven years old, on the back per element (a); and that the evidence otherwise supported elements (b)[6] and (c).  Rather, the focus of his argument is upon the requisite *mens rea* of this offense.  In the words of his brief, he contends:

---

[5] In relevant part, KRS 508.120 provides:

> (1) A person is guilty of criminal abuse in the third degree when he recklessly abuses another person or permits another person of whom he has actual custody to be abused and thereby:
>
> > (a) Causes serious physical injury; or
> >
> > (b) Places him in a situation that may cause him serious physical injury; or
> >
> > (c) Causes torture, cruel confinement or cruel punishment;
>
> to a person twelve (12) years of age or less, or who is physically helpless or mentally helpless.

[6] Relative to element (b) of Instruction 6, Green states in his brief that "[t]he Commonwealth, at trial, essentially argued the Appellant striking B.G. with an unknown object caused torture or cruel punishment."  Green's intent behind making this statement is unclear; plainly, Instruction 6 demonstrates Green's statement is accurate.  However, if Green is insinuating that striking a person with any object hard enough to cause significant bruising does not qualify as "cruel punishment" for purposes of KRS 508.120(c), he is mistaken.  *See*, *e.g.*, *Mason v. Commonwealth*, 331 S.W.3d 610, 621-23 (Ky. 2011) (holding that for purposes of the abuse statutes, significant bruising can be sufficient evidence of "torture" or "cruel punishment").

-3-

[T]here was just simply no evidence supporting either a wanton or reckless mental state of mind in the case *sub judice*. Due process requires an instruction on a lesser included offense only "when the evidence warrants such an instruction." *Parker v. Commonwealth*, Ky., 952 S.W.2d 209, 211-12 (1997). Here, it did not.

In other words, Green asserts that to the extent any evidence adduced at trial supported that he abused B.G., it only supported that he abused B.G. *intentionally*. Thus, in his view, the jury should only have been instructed regarding first-degree criminal abuse.

With that in mind, we now turn to the relevant facts supported by the evidence adduced at trial. When this incident occurred, B.G. was seven years old. As indicated, Green is B.G.'s father. He is not married to B.G.'s mother, Whitney, but he had visitation rights. On Tuesday, January 29, 2019, Green picked up B.G. for an overnight visit. B.G. returned home the next day with bruising on his back, which had not been present before B.G. had gone to visit with Green. B.G. initially refused to say what had caused the bruising, but he eventually told Whitney that Green's beagle dog had done it. He then began to cry. After seeing the bruising, Whitney texted Green a photograph of the bruises and asked what had happened. Green responded the next morning and said that his dog could have caused it. He then proceeded to send a few more messages with other explanations for the bruising, including a suggestion that B.G. may have sustained the bruises playing with other children.

-4-

Whitney testified she noticed the bruises on B.G.'s back on the evening of Wednesday, January 30, 2019, after B.G. had taken a bath. Shortly afterward, Whitney took B.G. to his pediatrician, Dr. Augusta Mayfield, who determined that the bruising had been caused by multiple instances of blunt force trauma. Dr. Mayfield opined – and later opined at the trial of this matter – that the bruises were the result of abuse. Dr. Mayfield told Whitney that the Cabinet for Health and Family Services would become involved.

After the Cabinet was contacted, it directed Whitney to contact the sheriff. Thereafter, B.G. was interviewed at the Edmonson County Children's Advocacy Center regarding his bruises. There, B.G. continued to insist the bruises had been inflicted by Green's dog. Consequently, the authorities took no further action at that time. However, Sergeant Wally Ritter, who observed the interview on behalf of the Edmonson County Sheriff's Department, believed, based upon his training and B.G.'s demeanor, that B.G. was being untruthful.

The following April, B.G. once again visited with Green. Afterward, when he returned to Whitney's custody, he refused to eat or drink. B.G. then told Whitney that Green, and not the dog, had caused the bruising on his back during the prior visit in January while he was at Green's house. When later questioned at trial about the specifics of what he had related to his mother, B.G. testified in relevant part:

BG:  My dad hit me with something.

COUNSEL:  How did that happen?  Does that question make sense?  What had happened that led up to that?  How did that happen?

BG:  Um, I slammed the door open by accident and a bunch of nails fell out.

COUNSEL:  Okay.  What did he say when that happened?

BG:  Come into the house and wait for me.

COUNSEL:  What happened after that?

BG:  Um, he spanked me.

COUNSEL:  Okay.  Where on your body did he spank you?

BG:  On my back.

COUNSEL:  Okay.  Do you know, what did he use to spank you with?  Did he use something, his hand, anything?

BG:  I don't know, I was bent over.

COUNSEL:  You don't know because you were bent over?  So, did you ever see what you – how'd that make you feel?

BG:  Sad.

COUNSEL:  What happened after that?

BG:  Um, he sent me to my room.

COUNSEL:  Did he say anything to you after that?

BG: He sent me to my room and all that?

COUNSEL: Right after he spanked you, did he say anything?

BG: Yeah.

COUNSEL: What did he say?

BG: Well actually, no. He said it after I got out.

. . . .

BG: Um, I came back down. He said I could come back downstairs, and then he said, um, "I'm sorry and don't tell no one. If you tell them, tell them that the dog done it."

COUNSEL: Okay. Did the dog do it?

BG: No.

COUNSEL: Had the dog ever scratched you before?

BG: Um, yeah. But I, he, the dog scratched me before, yeah.

COUNSEL: But did the dog scratch you back then?

BG: No.

COUNSEL: Alright. So, what he told you to say, was that the truth?

BG: No. That was a lie.

COUNSEL: What happened next?

BG: Um, his girlfriend and his kids came, his girlfriend and her kids came home.

At trial, when asked why it had taken him until the following April to be forthcoming about the cause of the bruises on his back, B.G. testified he had insisted the dog had done it because Green had told him to do so, and "[b]ecause I didn't want to get my dad in trouble."

As discussed, Green argues the evidence presented was insufficient to demonstrate he possessed a "reckless" state of mind. We disagree. The applicable standard is set forth in KRS 501.020(4), which provides in relevant part:

> A person acts recklessly with respect to a result or to a circumstance described by a statute defining an offense when he fails to perceive a substantial and unjustifiable risk that the result will occur or that the circumstance exists. The risk must be of such nature and degree that failure to perceive it constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation.

Here, after the presentation of the foregoing evidence, the trial court determined a third-degree criminal abuse instruction could properly be given because, in its view, this evidence could fairly support an inference that Green, intending to discipline B.G., caused B.G. to suffer unintended injuries. We agree. "Proof of intent . . . may be inferred from the character and extent of the victim's injuries. Intent may be inferred from actions because a person is presumed to intend the logical and probable consequences of his conduct and a person's state of mind may be inferred from actions preceding and following the charged offense." *Parker v. Commonwealth*, 952 S.W.2d 209, 212 (Ky. 1997); *see also Davis v.*

*Commonwealth*, 967 S.W.2d 574, 581 (Ky. 1998) (in prosecution for criminal abuse and homicide, "[i]ntent may be inferred from the act itself and/or the circumstances surrounding it"). Moreover, our Supreme Court has indicated a jury could reasonably infer a reckless *mens rea* from evidence indicating the defendant acted violently toward a child, intending only to quiet the child; or that the defendant was rough with a child, intending only to scare or discipline the child. *Ratliff v. Commonwealth*, 194 S.W.3d 258, 275 (Ky. 2006).

Here, from B.G.'s telling of it, Green struck him in response to bad behavior, *i.e.*, B.G. had slammed and thereby damaged a door in Green's house. It could also be inferred that Green was unaware of the extent of the injuries he inflicted upon B.G. until Whitney sent him a picture of the bruises later that evening. Specifically, B.G. testified he had been wearing a shirt when Green hit him on his back, and that his reaction to being hit – that it made him feel "sad" – was largely emotional.

That Green had not intended to inflict the extent of the injuries he had inflicted upon B.G. could reasonably be inferred from B.G.'s testimony that Green apologized to him afterward. Likewise, it could also be reasonably inferred that Green was surprised at the extent of the injuries he had inflicted upon B.G., based upon Green's texted reactions to the picture Whitney sent him of B.G.'s bruises, and particularly his concessions that perhaps his dog had *not* caused them. In

short, the evidence adequately supported a reasonable inference of recklessness, and it was properly considered a question for the jury. The trial court committed no error by instructing the jury with respect to third-degree criminal abuse.

## *IN CAMERA* TESTIMONY

Prior to trial, the Commonwealth moved pursuant to KRS 421.350 to allow B.G. to testify via closed circuit television in the judge's chambers, rather than on the witness stand in the courtroom with Green. Its motion was granted. Now on appeal, Green argues the trial court erred in granting the Commonwealth's motion, and for two reasons. First, Green asserts in his brief:

> Here, of interesting note is that almost every reported case under KRS 421.350 is associated in some way or another with the emotional trauma a child may be subjected to when facing the criminal defendant, in an open courtroom, who has sexually assaulted him/her. This matter had not the slightest allegation of any sexual offense.

In other words, Green appears to believe that KRS 421.350 only applies to child victims of sexual assault. With that said, Green ignores the plain language of KRS 421.350. The scope of the statute is set forth in subsection (1), which provides:

> This section applies only to a proceeding in the prosecution of an offense, *including but not limited to* an offense under KRS 510.040 to 510.155, 529.030 to 529.050, 529.070, 529.100, 529.110, 530.020, 530.060, 530.064(1)(a), 531.310, 531.320, 531.370, or *any specified in KRS 439.3401* and *all dependency*

-10-

> *proceedings pursuant to KRS Chapter 620*, when the act is alleged to have been committed against a child twelve (12) years of age or younger, and applies to the statements or testimony of that child or another child who is twelve (12) years of age or younger *who witnesses one of the offenses* included in this subsection.

(Emphasis supplied.)

As indicated, KRS 421.350 is broader than what Green portends. For instance, it applies to witnesses of an offense, not merely victims. It also applies to offenses and proceedings which have no required relationship to sexual abuse, such as dependency proceedings. More relevant to this matter, the trial court correctly determined that KRS 421.350 also applied where, as here, the trial involved a charge of first-degree criminal abuse which, as an "offense . . . specified in KRS 439.3401," is also within the scope of that statute. *See* KRS 439.3401(k).

Second, Green argues that, contrary to KRS 421.350(2), the trial court failed to make a specific finding as to why there was a "compelling need" for B.G. to testify outside of his presence.

In determining whether a "compelling need" exists to utilize closed circuit television for purposes of KRS 421.350, there must exist a "substantial probability that the child would be unable to reasonably communicate" due to the presence of the defendant. KRS 421.350(5). Because preventing the alleged perpetrator from being present during testimony implicates the Confrontation Clause of the Sixth Amendment, the requisite findings outlined in KRS 421.350 –

-11-

including a specific finding of "compelling need" – must be explicitly made and its provisions scrupulously followed. *Price v. Commonwealth*, 31 S.W.3d 885 (Ky. 2000). On appeal, the trial court's determination under KRS 421.350 will not be disturbed absent an abuse of discretion. *Danner v. Commonwealth*, 963 S.W.2d 632 (Ky. 1998).

That aside, Green's argument misrepresents the record. The trial court granted the Commonwealth's motion during a pre-trial hearing on the morning of January 9, 2020. At the hearing, B.G.'s therapist, Rebecca Woodrow, testified regarding the need for B.G. to testify via closed circuit television. Thereafter, based upon Woodrow's testimony, the trial court made a specific finding on the record that there existed a compelling need for B.G. to testify via closed circuit television and granted the Commonwealth's motion.

Regarding why it was substantially probable that B.G. would be unable to reasonably communicate to the court with the defendant present in the room with him, Woodrow testified that most children have difficulty facing an accused in court, especially when the accused is their parent. The record supports that this was particularly the case with B.G. Woodrow testified B.G. "would likely be quiet or shut down if he is in the room with the defendant. This is a child who would whisper to me and stand next to me in my office to share things for quite some time." She also explained B.G. was particularly averse to telling the truth if

he perceived that doing so could be detrimental to the adults in his family. In that respect, Woodrow related in her own words another incident that had occurred during the fall of 2019,

> where [B.G.'s] paternal grandparents had come to the school for grandparents' day and he did not tell his mother. His mother knew from some other information, but he would not tell her, and when she asked him about it, he was afraid to tell because he didn't know if he could see his paternal side of the family and he did not want to get the adults in trouble.

It is undisputed that Woodrow possessed the requisite credentials, experience, and familiarity with B.G. to render an expert opinion relative to whether a compelling need existed for B.G. to testify outside of the courtroom, away from Green. Green does not challenge any aspect of Woodrow's testimony; indeed, he chose not to cross-examine Woodrow during the January 9, 2020 hearing. Green does not claim that the trial court abused its discretion by relying upon her testimony to justify its decision. Likewise, because Woodrow's testimony was substantial evidence supporting the trial court's decision, the trial court did not abuse its discretion. The trial court committed no error in this respect.

## CONCLUSION

We have reviewed the breadth of Green's arguments on appeal. He has identified no instance of reversible error. We therefore AFFIRM.

ALL CONCUR.


BRIEF FOR APPELLANT:

Dennie Hardin
Bowling Green, Kentucky

BRIEF FOR APPELLEE:

Daniel Cameron
Attorney General of Kentucky

Kristin L. Conder
Assistant Attorney General
Frankfort, Kentucky