**Reubin MARCUM and Margaret Hoskins, Appellants,**

v.

**COMMONWEALTH of Kentucky, Appellee.**

Court of Appeals of Kentucky.

June 15, 1973.

A. Douglas Reece, Manchester, for appellants.

Ed W. Hancock, Atty. Gen., G. Edward James, Asst. Atty. Gen., Frankfort, for appellee.

PALMORE, Chief Justice.

Reubin Marcum and Margaret Hoskins were jointly indicted, tried and found guilty of murdering Margaret's husband, Elbert "Preacher" Hoskins, and they appeal from a judgment sentencing each of them to life imprisonment. Cf. KRS 435.-010.

It is our opinion that the evidence was not sufficient to support the conviction of either.

Unquestionably the victim was murdered, but there was no evidence to identify either Margaret or Reubin as the killer and, if one of them in fact committed the offense, no evidence of any complicity on the part of the other. It is almost, though not quite, the classic situation in which even though it may be certain that one of two persons committed a crime, unless the guilt of one can be established both must go free. Any other result would place the burden of proof on the innocent party.

Elbert and Margaret occupied a small dwelling in rural Clay County. They had been married for 16 years and had three sons, Frank and Charles, 13 and 14 years of age, and a baby ten months of age. Elbert was 43 and Margaret 37 years old. Elbert's 71-year-old father, Steve, also lived in the house, and Reubin Marcum, who was the same age as Steve (71), had been staying there "most of the time,"

sleeping in the same room with Elbert, Margaret and the baby. This rather unusual arrangement predated (and presaged) the birth of the baby; both Margaret and Reubin testified that Reubin was its father.

Evidently all of these people (except, possibly, for Reubin, who said he was "retired") were living on social security and government food stamps. Reubin had been staying with the Hoskinses for a year and a half or two years. He had a wife living at his "home place," which was somewhere in the general vicinage, but the record is silent with respect to her current role, if any, in his domestic affairs. Reubin's explanation for having moved into the Hoskins home was, "We went to church together for years," and he said the reason he slept in the room with Elbert and Margaret was that Elbert "would not agree for me to sleep no where else and had mighty little more room."

Both Margaret and Reubin testified that the more intimate aspects of their relationship existed with Elbert's consent and approval. According to Margaret, Elbert had undergone a vasectomy some years before and could not have any more children. Reubin said that Elbert told him "he wanted another baby to put on his social security." Both testified that Reubin never slept with Margaret and that no sexual intercourse between them ever took place except at Elbert's instigation, when he would take Margaret to Reubin's bed for that purpose and remain in the same bed with them until the mission was accomplished.

The room in which Elbert, Margaret, the baby and Reubin slept was one of two rooms adjoining a front porch, the other being a living room. The front door of the house entered the living room at a point close to the front bedroom wall, and the entrance to the bedroom from the living room was located toward the front, so that upon going into the house one would turn immediately in order to enter the bed-

room. The bedroom was very small, seven feet wide and 11 feet deep (front to back). The Hoskinses used a double bed located in the far corner. Crosswise at the foot of this bed, toward the front window, was a "three-quarter" size bed in which Reubin slept. There was a lamp on the front porch which cast some degree of illumination into the bedroom and was left on at night so that Margaret could tend to the child, who at the time of the killing was suffering from an ailment called the "thrash." Also, as it was a hot night and Margaret did not want to use the electric fan while the baby was under the weather, the front door of the house was propped open for additional ventilation. This door swung inward and to the right and, when so opened, would partially obstruct the entrance from the living room into the bedroom.

A kitchen and another bedroom were located to the rear of the house behind the living room and front bedroom, and there was another bedroom in the basement under the kitchen. At the time of the murder the back bedroom on the main floor was occupied by Steve and Frank Hoskins and the basement room by Charles Hoskins.

On the night of July 21, 1972, Elbert, Reubin, and Charles, the oldest Hoskins boy, attended an auction sale at a nearby community and purchased two bicycles and a baby seat for the Hoskins children. After returning home they had something to eat and by midnight everyone had retired for the night. At some time around 2:30 A.M. Elbert was shot while lying on his back in bed. One .38-caliber bullet entered his right breast and lodged behind his left shoulder, and another entered his mouth and lodged in the left rear portion of his cranium. Testimony admitted over objections by the defendants indicated the presence of powder burns.

Margaret was occupying the side of the bed next to the wall, with the baby be-

tween her and Elbert. She says that she was awakened by "some kind of noise" and "jumped up" into a sitting position, following which, in her own words, "when I looked down at him I seen the blood on him and started screaming and grabbed the baby and got out of bed . . . . The foot of the bed toward Reubin's bed and I come across over his feet. You couldn't, the beds are that far apart and you couldn't get out between them hardly." She explained that she was able to see the blood on Elbert by reason of the light from the front porch. She saw no one else in the room except for the baby and Reubin.

Reubin testified that "a noise woke me and Margaret was hollering something is wrong with Preacher and she jumped out of bed and by that time I got out of bed and looked over and saw blood on his chest and we was all just mixing around. She was hollering for her boy and old man Hoskins and I went out on the porch but I never saw nobody at all. I come back in and dressed—I was undressed—and dressed and Margaret said we better go and get the law," etc.

Steve Hoskins said that he went to bed around midnight and that some time thereafter "I heard two somethings went to me like down in the basement . . . And the boy, oldest boy come running up out of the basement and come running into the foot of the bed and I slept there on the right in a room—me and the other boy, Frank—and this boy come running on his hands and feet and hollering what is a matter . . . The baby boy [Frank] sleeps behind me and jumped out over me and run in while I was getting my pants on to get in there to see what the trouble was and Margaret met me at the living room door and said, 'Get up old man, somebody shot through the house and killed Preacher.'"

Steve estimated it was "five or ten minutes" from the time he heard the "two somethings" until he reached the front bedroom. Reubin was partially dressed and Margaret had on a "shimmy."

Charles, sleeping in the basement, was awakened by his mother's screaming and was the last one to reach the front bedroom. He said that when he arrived "Mommy was standing at the door screaming and Reubin was in the living room screaming and hollering and Grandpa in there where he was and Frank in there crying."

Frank, sleeping with his grandfather, also testified that he was awakened by his mother's screaming whereupon he ran into the front bedroom and arrived just after the light had been turned on. He said that Reubin was putting his clothes on and "Mommy was standing there crying and we got her out and me and Reubin went out on the porch to see if we could see anybody."

Margaret, Reubin and Frank went to a neighbor's down the road and notified the sheriff. Steve and Charles remained at the house. Charles said that Steve went out in the yard three or four times before the officers arrived. In the course of their investigation the officers made a search for the murder weapon, but it was never found. There was no evidence that any of the people in the house owned or had ever possessed a firearm of any kind.

Steve, Elbert's father, testified that at some time within a week before the tragedy Elbert had an altercation with Margaret and that Reubin tried to intercede, whereupon Elbert told him to get out of his house and Steve hit him (Reubin) with a walking stick. According to Steve, Reubin then fetched up an axe but ran off when Steve advanced on him with his cane. Both Reubin and Margaret denied that such an event took place. Neither Charles nor Frank had witnessed any difficulty between Elbert and Reubin. In fact, Charles

said, "They got along good." On the other hand, Margaret and Reubin testified that Steve and Elbert had trouble a few times over the fact that the old man did not like Reubin to be there, which Steve denied, but he did acknowledge that Elbert "jumped on me one time. He asked me the truth and I told him near the truth as I knowed and he smacked me in the face and I went to my oldest boy's where I am staying now and he come and begged me to come back to the house."

We have outlined the evidence at some length in order that its sufficiency or insufficiency to support the conviction may be fairly exemplified. As may be seen, it would sustain a finding of motive on the part of both defendants, but neither motive alone nor motive plus opportunity (or presence at the scene) is enough to justify a conviction. See, for example, Holman v. Commonwealth, 291 Ky. 622, 165 S.W.2d 167 (1942); Ratliff v. Commonwealth, 406 S.W.2d 728 (1966); and Hollin v. Commonwealth, 307 S.W.2d 910 (1957).

That the death wounds bore powder burns indicative of a shooting at very close range does not exclude the possibility that someone entered the room from outside and committed the murder, but even if it did, there is nothing to indicate which of the two suspects is the culprit. Assuming that either of them did the shooting, motive and presence alone could not serve to convict the other as an accomplice.

We find no error except in the denial of a peremptory instruction. If upon another trial the evidence be substantially the same the appellants will be entitled to a directed verdict of acquittal.

PALMORE, C. J., and MILLIKEN, OSBORNE, REED, STEINFELD and STEPHENSON, JJ., sitting.

All concur.